## IN  THE  UNITED  STATES  DISTRICT  COURT
## FOR THE DISTRICT OF COLUMBIA

**DONGFANG SHAO**
**15463 Arnold Palmer Dr.**
**Haymarket, VA 20169**

        **Plaintiff,**

        **v.**                                      **Civil Action No.**

**CARLA HAYDEN, in her capacity as**
**LIBRARIAN of CONGRESS**                  **Jury Trial Demanded**
**101 Independence Avenue, S.E.**
**Washington, DC 20540**

        **Defendant.**

### COMPLAINT AND JURY DEMAND

Plaintiff Dongfang Shao, by and through his undersigned counsel, brings this Complaint because the Library of Congress ("Library"), through its management personnel, discriminated and retaliated against him by depriving him of another proper performance evaluation and by various acts of offensive and objectionable conduct constituting harassment, all of which aggregated together created and maintained a hostile work environment which persists, on the basis of his national origin (China), his race (Asian), and his age (70). Dr. Shao seeks appropriate legal and equitable remedies to compensate him for the consequences of these unlawful and adverse acts and to ensure such discriminatory animus which now is pervasive and permeates the Asian Division ("AD") of the Library ceases.

### JURISDICTION AND VENUE

1.     This civil action is brought pursuant to the Congressional Accountability Act ("CAA"), 2 U.S.C. §1302(a)(2), which adopts Title VII of the Civil Rights Act of 1964, as amended, specifically, 42 U.S.C. §2000e *et seq.* (prohibiting discrimination on the basis of national origin and race, among other bases).

2. This Court has jurisdiction pursuant to 28 U.S.C. §1331 and 42 U.S.C. §2000e-(f), and §2000e-16.

3. Venue for this Civil Action is appropriate in the United States District Court for the District of Columbia pursuant to 28 U.S.C.§1391 and 2 U.S.C. §1408 because all of the unlawful employment actions at issue occurred in the District of Columbia. Dr. Shao is employed with the Library within this judicial district and the Library is within this judicial district.

4. Dr. Shao has fulfilled all conditions precedent under Title VII of the Civil Rights Act of 1964 prior to commencing this civil action and has otherwise exhausted his administrative remedies.

5. This civil action is filed within the 70-day period after Dr. Shao filed his initial claim with the Office of Congressional Workplace Rights on December 4, 2023.

## THE PARTIES

6. Plaintiff Dongfang Shao was born in China and is a male citizen of the United States. Dr. Shao received his undergraduate and graduate degrees in History from Beijing Normal University and a doctorate in History from the University of Hawai'i at Manoa. He taught in the Chinese Studies Department of the National University of Singapore for five and one-half years before joining the faculty of Stanford University in the Department of Asian Languages in 1999, teaching courses in Chinese studies and supervising doctorate students for their dissertations. Dr. Shao also served on an Advisory Panel for the Chinese Library Service for the National Library Board of Singapore.

7. In 2003, Dr. Shao was appointed head of Stanford University's East Asia Library, the university's primary East Asian-language collection in the social sciences and humanities for all historical periods. His nine years of leadership had been characterized by tremendous growth in numerous dimensions – of collections, of staff, of services, of engagement with the scholars and students in East Asian studies at Stanford. During his tenure, he increased the library's international

stature, reorganized and doubled its staff, and garnered a substantial increase in its base budget. Dr. Shao was also appointed by Stanford University President as Stanford Libraries Advisory Council member from 2013 through 2022.

8.     In 2007, he earned a Master's degree in library and information science from San Jose State University with a thesis on Chinese electronic resources.

9.     Dr. Shao has been employed by the Library of Congress ("Library") continuously since April 2012 as Chief of the Asian Division, a Senior Level ("SL") Executive position.

10.     Defendant Carla Hayden is the Librarian of Congress, the head of the Library, which is an agency of the United States Government. This civil action is brought against her in her official capacity.

## PROCEDURE

11.     On August 28, 2020, Dr. Shao filed a Complaint against Defendant Carla Hayden, alleging that the Library had discriminated against him in various ways, including giving him an annual performance rating below what he should have received. That Complaint was docketed as 1:20-cv=02413-EGS.

12.     On March 4, 2021, Dr. Shao filed a second Complaint against Defendant Carla Hayden, alleging that the Library had discriminated against him in various ways, including giving him an annual performance rating below what he should have received. That Complaint was docketed as 1.21-cv-576 (EGS).

13.     The Court consolidated the cases on May 6, 2021.

14.     The instant Complaint is based on conduct after the filing of the second complaint.

## FACTS

15.     Dr. Shao's supervisor is Eugene Flanagan, the Director of the Library's General and

International Collections Directorate ("GICD").

16.     GICD was established in October 2018 after the Collections and Services Directorate was divided into two Directorates. The other new Directorate was the Special Collections Directorate.

17.     Mr. Flanagan was appointed as GICD's inaugural director on October 1, 2018.  Mr. Flanagan was not hired after an open search, which is the typical process the Library utilizes when it seeks to fill a director level position. Nor did the Library publicly announce the vacancy and appointment for the GICD Directorship.

18.     The Asian Division is one of the most ethnically diverse units in the Library.  Workplace diversity and inclusion is given great merit in this multilingual and multicultural organization. "Leveraging Diversity" is reflected in the standard Library Performance Plan/Requirement for supervisors and Senior Level executives. To build solid foundations of diversity and inclusion in the workplace, Dr. Shao has actively worked to create equity and equality in job assignments and evaluations among 21 employees in the Asian Division, to ensure all employees feel they are valued regardless of their race, gender, ethnicity, culture, religion, or sexual orientation. As one of the Asian American staff members, most of them being first generation immigrants, Dr. Shao has contributed much to the Library of Congress, and the Asian Division's achievements under his leadership has been exemplified in the AD FY2023 Annual Report. [Complaint Exhibit 1]. All Asian American employees who know Dr. Shao regard him as a very respectful manager in the Library, and leaders of the Library of Congress Asian American Association (LCAAA) consider Dr. Shao as their highly valued mentor. Unfortunately, Mr. Flanagan, a director who does not know the Library's Asian collections and basic library knowledge such as holding records and vernacular languages, forgets his obligations to the Asian immigrants and loses sight of the far greater opportunities to advance understanding and cooperation. One of the Library's supervisors who is a China specialist questioned

Mr. Flanagan by asking, "This man exudes an untouchable, old hatred, and racism that he doesn't even realize this is what is driving his evaluation. Deep set fear, misunderstanding, and ignorance. How can he possibly praise the work of your staff and not see that their success and contribution to the Library is because of your encouragement and direction?" As a result, Dr. Shao and other Asian American staff report unacceptably high levels of depression and isolation or simply clubbing up each other because of cultural differences and language barriers.

19.     As of December 31, 2023, the Asian Division of the Library consisted of 21 employees, 12 of whom are Asian American, one (1) Japanese, and one (1) African American. All of the Asian American staff members in the Division are first generation immigrants and have made great contributions towards expanding and managing the Asian collections at the Library, a main purpose for the Library's recruitment of Dr. Shao to become a Senior Level Executive and Chief of the Asian Division of the Library.

20.     Dr. Shao demonstrated an awareness of the benefits of diversity by hiring six (6) reference librarians and supervisor who are White and non-Asians, because the Asian Division had only one (1) White employee when he became Chief.

21.     The Asian Division collections at the Library are now estimated to amount to more than 4 million physical items in more than 190 languages and dialects, the largest assemblage of Asian materials outside of Asia.

22.     Prior to Mr. Flanagan's current position, he was Director of National Programs in the Library's National and International Outreach ("NIO") until NIO was disbanded in 2018. Before the NIO position, he was a Director of Business Enterprises in the Library. Prior to that, Mr. Flanagan was a Library contractor with KPMG LLP. One of Mr. Flanagan's predecessors said to Dr. Shao about Mr. Flanagan,

*LC really does not value real scholarship in its senior staff. It is more concerned to act according to diminishing standards of excellence in government agencies. I always felt sorry for your new boss who was always demeaned by his series of supervisors at LC. He arrived at the Library as a member of a team of contractors from KPMG (an accounting firm) who were hired to undertake a study and create a master plan for the reorganization of storage space. Dizard did not trust LC staff to create such a plan. This insulted Steve Herman and others. The final plan — a thick document with many images and drawings was very expensive and was not implemented. Why he was picked up by the LC as a contract hire to work on commercial products I don't know. But he was bounced around different depts because no one knew really what to do with him. I believe he must have been poisoned by this experience of being mistreated. He seemed to be quite pleasant as an educated Irish immigrant, but from my perspective he projected a sense of being a loser. As such, he is not likely to be straight forward and confident in himself while serving as a senior manager. It is best to be evasive with him, as he is probably insecure at many levels. I may be overly critical and should not criticize since I was not familiar with the details of his various employments at LC. But he was bounced around and now is probably a tool for top management to do its dirty work.*

Asian Division staff may not be made aware of this issue and the severity of it. But as a chief Dr. Shao knows how disappointed he is now.

23.     Since 2018, Mr. Flanagan supervised Chiefs of seven (7) divisions, including divisions of Asian; African and Middle Eastern; European; Hispanic; Research and Reference Services; Science, Technology and Business; and Serial and Government Documents. The first four (4) divisions were international collections, which collect and manage most of the non-English materials in the Library.

24.     Originally, the GICD consisted of three (3) General Collections divisions and four (4) International Collections divisions. Five of the seven division Chiefs are White, one is African American, and Dr. Shao is Asian American.

25.     The non-English language collections at the Library account for approximately half of the Library's book and serial collections.

26.     Mr. Flanagan is not Asian or a person of Asian descent.

27.     Under the Federal Title VII of the Civil Rights Act of 1964 and the Congressional Accountability Act ("CAA"), employers cannot discriminate against or harass employees on the basis

of their race/color, religion, sex/gender, or national origin. Likewise, the Americans with Disabilities Act ("ADA") prevents discrimination and harassment based on an employee's disability or perceived disability. And age discrimination is unlawful under the Federal Age Discrimination in Employment Act ("ADEA"). But these laws do not stop at discrimination and harassment of employees. They also make it illegal for bosses, managers, and supervisors to retaliate against any person because that person opposed an unlawful discriminatory action or practice, made a complaint about discrimination, testified regarding such conduct, or assisted in any investigation, proceeding, or hearing related to complaints of discrimination. According to U.S. Equal Employment Opportunity Commission, "Retaliation is the most frequently alleged basis of discrimination in the federal sector and the most common discrimination finding in federal sector cases." The anti-retaliation provision protects an individual from all retaliation. That being said, Dongfang Shao is filing an OCWR complaint to try to protect himself from retaliation under all circumstances. CAA laws to oppose discrimination are protected as long as Dongfang Shao is acting on a reasonable belief that something in the workplace may violate CAA laws. Dongfang Shao has exercised his rights under the CAA by filing OCWR complaints against Mr. Flanagan twice previously in 2020 and 2021, and two related lawsuits. Since then, Dr. Shao was reprised against for reporting facts and incidents of Mr. Flanagan's discrimination, harassments and mismanagement, and especially he received poor performance evaluation and rating by Mr. Flanagan in FY2023.

28.     One of the Library directors who oversaw area studies collections for more than ten years, especially the Asian Division, wrote about Dongfang Shao, "*You are such an excellent chief, in fact the best chief that the Asian Division has ever had in the last 50 years that I've known it. So keep pressing and don't get discouraged. Even if your work is never acknowledged, and the library will probably never acknowledge it, you and a small group of us—including Jeremy [Adamson]—*

*know what an amazing contribution you're making to the Division and really to the country.*" One of Dr. Shao's predecessors in the Asian Division wrote to him,

> *At the outset, let me express how distressing it is to hear your news. I have been working through the documents you sent me over the last several days and it has been painful to hear how much difficulty and stress you are experiencing. I must also admit that during my time at the Library I witnessed much of the same culture that is causing you so much difficulty. The institution has been struggling with issues related to equality and discrimination during much of the last 50 years and even before. It must be hard for you to have to resort to the current complaint process, because I can sense the high regard you hold for the Asian Division's staff and collections, as well as the considerable respect and honor that most staff have for the Library as a cultural institution of the highest order.*

It was not fair toward Asian Division management and supervisors who were behaving very professionally. One chief in GICD also commented on a statement by Professor Lauren Pfister, one of Dr. Shao's research collaborators and friends, "Prof. Pfister's remarks are spot on. He certainly knows and appreciates your outstanding work and leadership role in building and promoting the Library's Asian collections and molding the staff into a top tier dedicated reference, research and curatorial juggernaut."

29.     During the FY2023 annual performance evaluation for Senior Level Executives in the Library of Congress, Dongfang Shao's supervisor Eugene Flanagan used the performance review on October 23, 2023 to retaliate against Dongfang Shao, because Dongfang Shao had already filed two OCWR complaints against him for racial discrimination and harassment. Dongfang Shao also filed lawsuits in 2020 and 2021 respectively, alleging Flanagan repeated used vulgar, inappropriate, and gendered comments in addition to giving him lower performance ratings and baselessly blaming him for things he did not know or do.

30.     CAA laws prohibit punishing employees for asserting their rights to be free from employment discrimination including harassment. Asserting these rights is called "protected activity,"

and it can take many forms. In Dongfang Shao's case, it is unlawful to retaliate against employees for communication with a supervisor or manager about employment discrimination, including harassment. Because of Mr. Flanagan's lower ratings on Dongfang Shao's annual performance, he created conditions leading to potentially discriminatory wages.

31.     Mr. Eugene Flanagan discriminated against Dr. Shao because of his CAA activity to give a performance evaluation that is lower than it should be, and engaged in written abuse through his criticisms in his annual performance evaluations. He has made Dr. Shao's work more difficult by punishing him for a CAA complaint; he purposefully charged Dr. Shao's absence from attending onsite meetings, ignoring the fact that Dr. Shao had a workplace injury protected by the Department of Labor, entitling him to time off for medical treatment and telework accommodation that was ordered by an orthopedic doctor during that period.

32.     On October 23, 2023, Mr. Flanagan sent Dr. Shao his evaluation narratives on his FY2023 annual performance review and rating, but Dr. Shao was surprised to see his supervisor's biased narratives and unfair ratings on his annual performance. Dr. Shao concluded that he has never before read an annual review that reflected such grave hostility as in Mr. Flanagan's belittling evaluation of FY2023. If Mr. Flanagan had in fact found areas of Dr. Shao's performance in need of improvement, there are far more instructional and effective methods to communicate this assessment, if in fact his intention had been helpful.

33.     Dr. Shao seeks to receive a fair review process, including helpful observations at critical junctures throughout the year, when Dr. Shao could understand his supervisor's insights and adopt his suggestions, fairly and responsibly, in preparation for his annual appraisal quite understandably. Dr. Shao cannot gain any guidance from acrimonious criticisms that lack objectivity and have not been addressed beforehand, yet included in Mr. Flanagan's evaluative narratives. The two of them have had

their differences in the past, and the result did not serve the Asian Division well. In contrast to this negative situation, Dr. Shao believes the best working situations always involve honest and fruitful interactions between supervisors and Senior Level Executives, resulting in mutual benefits for the Library, its collections, and its users.

34.     Dr. Shao's leadership has wide support from Asian Division employees. People in other divisions who know him are aware of his high standards. His leadership directs Asian Division staff to rally more closely around the leadership of Dr. Hayden and the Library mission. He works steadily toward the Library's goals.

35.     Mr. Flanagan's FY2023 evaluation included factual errors, misstatements, and discriminatory conclusions based on Mr. Flanagan's retaliation and discrimination against Dr. Shao. An unbiased evaluation would have resulted in a higher rating for Dr. Shao.

36.     All of Mr. Flanagan's errors are thoroughly described in Section C of Dr. Shao's OWCR Claim. [Complaint Exhibit 2].

37.     Dr. Shao initiated the process of creative ways to reach new audiences through digitization. Dr. Shao collected and analyzed the Library's current Yongle Encyclopedia collection and recommend actions to set a multi-year project digitizing this famous text, one of the Library's greatest treasures. This included collaboration with other teams or service units, such as Conservation. This complex project involved multiple phases and took nearly a decade of preparation. In FY2023, Dr. Shao promoted the collection online through refined narratives and visual descriptions. Now, this rare historical artifact is available for research by scholars and bibliophiles worldwide. (See #42)

38.     Dr. Shao also led and held meetings to initiate the process to identify the Asian Division's top treasures (Tier 1 and Tier 2). He raised concerns, suggested methods, and made recommendations to safeguard these platinum collection items. The Safeguarding Plan divisional meeting discussion

brought out the weaknesses and strengths of the original material category definitions. Through all these means, Dr. Shao modernized the Asian Division records and processes of most valuable rare collections. With his confident leadership and rich experience, the Asian Division is now also in compliance with the Office of Inspector General's recommendations and guidance.

39.     Dr. Shao led efforts to reach out to existing and new audiences via posts and blogs on Facebook, which reached a milestone in FY2023 as the 4 Corners of the World blog posted its 500th post. It has also started a new type of post by interviewing staff from the overseas offices, an innovation proven to be popular and receiving many positive comments.

40.     Fourthly, the Asian American and Pacific Islander ("AAPI") Collection had been located within the Asian Division since 2007. The Library's AAPI Collection is an important repository of Asian American contributions, but it was not an appropriate location to house the AAPI collection in the Asian Division, because the AAPI collection had extended out of the traditional areas of acquisitions, reference, and outreach of Asian collections, and more importantly Asian American studies is an aspect of American studies and should be viewed as an integral part of the American experience—not just a foreign or immigrant one. Dr. Shao first proposed to resolve this problem by transferring the AAPI collection to the Manuscript Division and American Folklife Center. Dr. Shao solicited recommendations, received approvals, led collaborations, and completed the planning and preparation of the transfer. Under Dr. Shao's leadership, Asian Division staff will continue to serve as Recommending Officers for various vernacular languages related to AAPI materials. Dr. Shao's effort in leading this initiative better protected the AAPI collection and promoted its visibility and accessibility. It resulted in ensuring the best fit for AAPI's long-term home, the best use of staff resources, and the best service to AAPI researchers. But Mr. Flanagan wrongly criticized Dr. Shao, "Unfortunately, as an example of leading change it is diluted by Dr. Shao not taking the lead as requested by the director, and

by the subsequent delay and confusion among collaborators in SCD [Special Collections Directorate], MSS [Manuscript Division], and RRS [Researcher and Reference Services Division]."

41.     As one means of expressing his retaliation, Mr. Flanagan either ignored or downplayed Dr. Shao's accomplishments.  Unlike Dr. Hayden, who always appreciates and recognizes Library staff's work with encouragement, Mr. Flanagan never has expressed appreciation for Dr. Shao's extra duties serving as Acting Head of the AD Scholarly Services Section and Recommending Officer for the Chinese Collection as well as conducting reference services for Asian studies patrons. Mr. Flanagan sought to downplay and downgade Dr. Shao's outstanding accomplishments in FY2023, all in an attempt to discredit him and so to reinforce his wrongful containment and biased suppression of Dr. Shao. Mr. Flanagan's evaluation narratives include an avalanche of dishonesty. Dr. Shao fact-checked eight of Mr. Flanagan's allegations and criticisms and found that his remarks were teeming with false claims – a staggering quantity and variety of misrepresentations, exaggerations, and outright lies that made sheer wrongness a central feature of each of his narratives. He was serially untruthful when he downplayed Dr. Shao's accomplishments in the Asian Division. Repeatedly he fabricated and critically embellished his claims about the Asian Division projects led by Dr. Shao. At other times he has launched unfair and damaging attacks against Dr. Shao and other Asian Division employees. Obviously, then, he purposefully deployed various fictions to support his denunciations of Dr. Shao's leadership and achievements. It is completely illegal for supervisors to retaliate against employees who complain about workplace discrimination. But this is exactly what Mr. Flanagan did to Dr. Shao, inventing claims to ruin his reputation and humiliate him, because Mr. Flanagan knew Dr. Shao was going to expose his behavior.

## A. The Case Related to The Yongle Encyclopedia Digitization Project

42.     The Yongle Encyclopedia (Yongle Dadian)  was, in effect, a vast collection of excerpts

and entire works from the mass of traditional Chinese literature. Possibly the premodern world's largest reference work, this encyclopedia was an attempt to place all extant knowledge at the fingertips of the Ming dynasty's Yongle emperor. In 1408, the encyclopedia was transmitted as a single hand-written 15th century copy, and only around 430 of its 11,095 volumes survived. Fewer than 400 volumes of the three manuscript copies of the set survived into modern times.  The Library's Asian Division holds roughly a tenth of the Yongle Encyclopedia's surviving volumes, making it the largest collection outside of China. In FY2023, Dr. Shao oversaw the outstanding completion of an ambitious multi-year undertaking to catalog, conserve, and digitize 41 volumes of the Yongle Encyclopedia, one of the Library's greatest treasures. The project was first conceived in 2002 but began in earnest in 2014 under Dr. Shao's direction as Asian Division Chief. Consequently, in September 2022, the Library became the first institution to digitally publish the world's second largest Yongle Encyclopedia collection. Through concentrated efforts under Dr. Shao's outstanding leadership, this rare historical set of volumes is now available for research by scholars and bibliophiles around the world.

43.     This complex project involved several stages of preparation, including making a precise inventory, arranging appropriate housing, analytical cataloging, careful conservation, unique digitization, textural research, and user engagement, requiring intensive collaboration. Under Dr. Shao's direction, the Asian Division took some initial steps in 2014 by conducting a descriptive inventory of the volumes, and then placing them in a high security vault. In 2017, Dr. Shao submitted a digitization proposal, in response to which the Conservation Division completed a Feasibility Assessment Review in 2018. This affirmed the integrity of most volumes, while also prescribing the necessary preparatory treatment of all the volumes. As a result, the digitization project received approval that very same year. The next step was analytical cataloging. Previously, the volumes had been catalogued according to the book case where they are stored and so in ten groups. With Dr. Shao's direct involvement, in November

2018 catalogers from the Asian and Middle Eastern Division ("ASME") of the Acquisitions and Bibliographic Access Directorate ("ABA") replaced the group descriptions with 42 detailed records, involving one record for the collection as a whole, and one for each volume.

44.    During this major project, conservation, digitization, and digital publication proceeded simultaneously, with newly treated volumes passed on to the Scanning Center and then uploaded incrementally. All 41 volumes required some treatment; several volumes required critical conservation treatment. The AD facilitated fruitful exchanges between conservators at the Library of Congress and the National Library of China on treatment techniques and protocols. Treatment of all volumes was completed by July 2022. The Digital Collections Services (DCS) launched the *Yongle Dadian* Online Digital Collection in March 2021, and the final volume became accessible in September 2022. In FY2023, the AD conducted a systematic review of the collection and worked with DCS to rectify display errors. Research and user outreach were critical to this collaborative initiative. Through Dr. Shao's network, Professor Zhang Sheng, a leading authority on the Yongle Encyclopedia from the School of History, Beijing Normal University, published a study in Chinese exploring the provenance of the 41 volumes of the Yongle Encyclopedia held in the Library. Instructed by Dr. Shao, Mr. Chun Shun, former curator of rare books at Harvard-Yenching Library, who had advised the project since 2015, subsequently submitted a report in FY2023 on his examination and authentication of those 41 volumes. Subsequently, Dr. Shao arranged for a talk by a Library of Congress senior conservator on "Methods and Stages for Conserving the Yongle Encyclopedia." Under his direct guidance, a Chinese reference librarian worked with a Chinese technician and others to compile a bibliography of publications relating to the Yongle Encyclopedia. With his assistance and advice, in April 2022 the Scholarly Services Section Head gave a talk on the Yongle Encyclopedia digitization project to colleagues from the Council on East Asian Libraries. In April 2023, a Chinese collection librarian published a post entitled "Yongle

Encyclopedia Volumes Fully Digitized" in the 4 Corners of the World Blog, which Dr. Shao reviewed, edited, and approved. A Facebook post accompanied the blog post, and later an article, "Library Digitizes Rare Chinese Encyclopedia," appeared in the Library of Congress Gazette on June 9, 2023. Dr. Shao worked with the Office of Communications to create a press release: *Library of Congress Completes Digitization of Yongle Encyclopedia, Largest Reference Work of Pre-Modern Era.* In that article, it explained, "*Bringing the Library's 41 volumes of the Yongle Encyclopedia to a worldwide audience has been a major undertaking. Dr. Shao was proud to have brought it to a successful conclusion as evidenced by its extraordinary impact of the Library's mission, thanks to all those who have contributed to this landmark achievement*." As a Chinese reference librarian pointed out,

> *Digitizing the encyclopedia was a yearslong collaborative effort involving conservation, digitization, reference and metadata librarians. All volumes required conservation treatment prior to digitization; one seriously damaged volume took three conservators 15 months to treat. Then came high-resolution photography and compilation of the images as a digital collection. Newly created metadata improve the searchability of content in electronic and paper formats alike.*

During this multiple-year project, it was precisely Dr. Shao who produced the 'leading change', resulting in scholars and bibliophiles worldwide rejoicing at the digitization of this priceless collection. A frequent user of the Asian Reading Room and a Chinese history professor at John Hopkins University told Dr. Shao recently regarding this digitization of the Yongle Encyclopedia, "Given the fact that the Library has deferred maintenance on many of its rare books for decades--what you are doing is absolutely forward-looking... especially in combining preservation with promotion of new knowledge of old things."

45.    The Yongle Encyclopedia project, though completed before the release of the Library's FY 2024-2028 Strategic Plan, anticipated many of its themes, including being digitally enabled and user centered, being inclusive and welcoming, thereby prioritizing collaborations, partnerships and community engagement. In each of these areas the project engendered innovation, whether in areas

15

directly controlled by the Asian Division under the leadership of Dr. Shao or in areas falling within the purview of other divisions.

**B. The Case of Relocation of the Asian American and Pacific Islander Collection**

46.     In FY2023, Dr. Shao initiated the transfer of the Asian American and Pacific Islander Collection ("AAPI") from the Asian Division to other divisions. Dongfang Shao consistently completed all assignments for this project and helped directly to ensure the best fit for AAPI's long-term home, the best use of staff resources, and the best service to AAPI researchers. The Asian American and Pacific Islander Collection had been located within the Asian Division since 2007, but it was not a good fit for the AD because most of the items were in non-Asian languages and its materials consisted primarily of contemporary manuscripts, documents, and photographs, rather than books. Dr. Shao proposed to resolve these problems by transferring the AAPI collection from the AD to another division or divisions where it would be within scope of their collecting policy. Dr. Shao initiated the discussion of transferring the AAPI collection from the AD to the Manuscript Division ("MSS") and the American Folklife Center ("AFC"). He also reviewed and discussed the "January 26, 2023 Memo to the Director of Special Collections Directorate from Manuscript Division" with the Manuscript Division Chief, Head of Acquisitions and Outreach Section, and Head of Preparation Section. Consequently, the Manuscript Division agreed to receive a major part of the AAPI Collection, and American Folklife Center agreed to receive the AAPI-related miscellaneous community collection. It was agreed that the AD would assist the Manuscript Division and the American Folklife Center in processing the small number of Asian language materials in the AAPI Collection, and the AD staff would continue to serve as Recommending Officers for various vernacular languages related to AAPI materials. Dr. Shao conducted effective conversations about the timeline for the transfer of the collection with Manuscript Division and American Folklife Center colleagues. The AD staff offered input and suggestions to the Manuscript

Division and American Folklife Center staff about potential acquisitions, and would assist the Manuscript and Folklife staff, if needed, with Asian-language materials. Through Dr. Shao's leadership and guidance of the AD staff, the planning and preparation of this major project was completed, demonstrating his ability to guide and help staff through times of transition, as well as to anchor collections in areas of the Library where they will appeal to the greatest number of users. This transfer had positive impacts in multiple ways. First, the transfer allowed language specialists in AD to focus on work that only they can do, rather than spending time on English-language materials that librarians in other divisions could handle. Secondly, it provided better conditions for the storage and organization of the contemporary archival materials in the AAPI collection, which shed light on the history of the country's relationship with race. Manuscript and Folklife professional staff have the archival training needed to maintain, process, preserve, and develop the AAPI Collection. Library users can still access AAPI material in these new custodial divisions with the AD support for any Asian language issues. Two interim reference librarians of the AAPI collection reported the process of the transfer of the AAPI collection, offering a significantly different account about Dr. Shao's leadership throughout the whole process and the Asian Division's role in that project, accounts that contradicted Mr. Flanagan's allegations. This report provided a very detailed and accurate account of how Dr. Shao and the Asian Division took the lead in the project from the very beginning until the completion of the transfer of the AAPI collection during this past year. Because it was written by a person who was involved in that whole process, it also reveals just how very misrepresentative Mr. Flanagan's assessment of this process was, and how flagrantly and arbitrarily in a few sentences he had turned what was a long and productive process into a "reason" for justifying his criticisms. In this account, Dr. Shao (sometimes referred to as "the AD's chief") was intimately and obviously involved with numerous aspects of the whole process. [Complaint Exhibit 3].

**C. A Peculiar Objection**

47.     Mr. Flanagan objected to Dr. Shao's efforts to build the largest Asian collections outside of Asia. As it is a well-known fact that the Library does in fact possess the largest Asian collections outside of Asia, certainly it has a responsibility to continue to collect, preserve, and share Asian treasures with users, as well as to best serve Congress, researchers, and all American people.

**D. Disregarding A Workplace Injury**

48.     In his FY2023 evaluation narratives, Mr. Flanagan criticized Dr. Shao for not attending Mr. Flanagan's onsite meetings. Thus, Dr. Shao received inappropriate and undesirable onsite work assignments. In this regard, he completely ignored Dr. Shao's workplace injury. Among other assertions, Dr. Shao claimed Flanagan called him to be onsite during his medical leave, when telework arrangements had been set in place due to his workplace injury, all of which was recommended by an orthopedic doctor. Yet Mr. Flanagan used these absences as excuses for demeaning Dr. Shao's performance and denied his awards and recognition.

**E. The Case of a Notable Mongolian Event**

49.     Mr. Flanagan repeatedly attempted to blame Dr. Shao for "mishandling" a notable Mongolian event. However, there is no evidence for Mr. Flanagan's claim, and once again another colleague, the Asian Division Mongolian specialist, provided a very different description of the Mongolian event:

> *You [Dr. Shao] asked me to provide additional details about our August 3 Mongolian Dinosaur Fossils Repatriation Event. I consulted you when the Embassy of Mongolia first asked if we could host this ceremony, and you agreed that it would be an appropriate event to promote our Mongolian collection, especially since either the Prime Minister or Foreign Minister would attend. So I submitted the draft Special Events proposal to our liaison Elizabeth [Schreiber-Byers] via you, and on her advice, submitted the proposal to the Special Events Committee. I presented it to the SEC committee, attended by all library officials including OGC, and received approval from Library Special Event Committee on July 11. I was assigned a LEO coordinator and media team for recording and met with them on the event logistics throughout July, coordinated with the Embassy. You agreed to give the introductory remarks, and the Embassy*

*prepared the program and list of invited guests. As a courtesy you reached out to Hannah [Sommers] to see if she would like to give the remarks instead of you. All was proceeding very nicely, but we were then informed that the event was being questioned by higher levels. This was a surprise after all the work that had gone into it, and all was according to our procedures. You and I discussed by phone how best to respond, and since I was the organizer I replied via emails, based on our discussions, to answer the additional questions. However, on the afternoon of August 2, we received an email that the event was being re-considered and to wait further instructions. This was so puzzling since all had already been approved and well planned. You and I consulted on how to handle concerns, and were finally informed that Hannah would give remarks but our role would be minimized. I had to inform the Embassy at 7:00 the evening of August 2 of the changes required by the library, and the new program schedule. The event was attended by State Department officials, Homeland Security, and ICE officials, and the Mongolian Ambassador and Foreign Minister spoke. Hannah offered the official LOC greeting, but we were told to remain quiet in the back of the room. On the way into the event the media team assigned to the event caught up with me to say they were not permitted to film it and removed their cameras. It was a shame because the event, and the rare dinosaur fossils, were so beautiful, and we should have at least had an internal documentation. National Geographic media team covered it but we could not, and Homeland Security featured it in a news release on their website. Nonetheless you and I worked together to make the most of circumstances, and to accept the changes in the interest of the Library. We discussed many times, and were at least glad the event was allowed to proceed. We were never given a clear reason why it was questioned just before the event, after going thru all the proper procedures. It would be useful to know exactly why there were these late concerns at the higher levels, so we can learn and address these concerns before they arise in the future. Our only interest was in promoting the Library and its collections, and I did appreciate your advice, guidance and support throughout the event.*

## F. The Case of the 70th Anniversary of the U.S.-Korean Alliance

50.        Mr. Flanagan falsely accused Dr. Shao of the AD's involvement in the event of commemoration of the 70th Anniversary of the Alliance between the United States of America and the Republic of Korea in the Library.  With Dr. Shao's approval, an AD Korean reference librarian cooperated with ASME to co-organize a symposium on the 70th Anniversary of the US-Korea Alliance. This was jointly hosted by the AD, the Korean Library Association, ASME Division of ABA, Veterans History Project, and the Visitor Events Office. The AD librarian helped to plan the symposium, moderated the event, and provided a tour of the Asian Reading Room for participants. The event brought together 50 attendees, including people from different branches of the government, D.C. area professors and students, NGOs, CRS interns, as well as the Deputy Librarian, Robin Dale, and the

Republic of Korea Embassy's Minister Consul-General. Many commented that the symposium's new, humanistic approach to the US-Korea Alliance was truly memorable, contributing to the Library's influence with the largest Korean collection in U.S.A on researchers and institutes in North America. The Korean reference librarian who was directly involved and participated in the 70th Anniversary of the US-Korea Alliance event provided the following detailed account of the AD's involvement and Dr. Shao's guidance to her for this event:

On February 28, AD was informed about the Korean Library Association's (KLA) proposal of LOC-KLA joint event on the 70th anniversary of the U.S.-Korea Alliance Conference from ASME/ABA. Since Elli Kim was the Korea subject specialist, Dr. Shao forwarded the message to her and engaged in discussions regarding the event. Initially, the KLA tentatively proposed the event for May. Considering this, Dr. Shao expressed that AD can support participation in the event. However, there were concerns regarding Elli Kim's workload as she was the sole librarian for the Korean collection, and her annual leave had been scheduled from May 18 to June 16. This concern was conveyed in three email exchanges on February 28. In response, Elli Kim notified ASME/ABA that while she could assist in preparing for the event; but, she wouldn't be able to attend the event if held in May due to her scheduled annual leave. This communication took place on March 2 via email. Subsequently, KLA informed the flexibility of the event's dates, either June 26-27 or September.

On Friday, March 3, ASME/ABA, AD, and the Office of the Special Events convened for their initial meeting. Following this, Elli reported back to Dr. Shao with the following updates:

1. The Event Office expressed their intent to play a supportive role due to the specialized nature of organization and execution, suggesting that ASME and AD might need to take the lead as co-sponsors.

2. AD's responsibilities were outlined, including organizing and collaborating with ASME/KLA to establish the conference theme and program content, inviting guest speakers, an invitation list for event attendees, and arranging the ARR tour. (This information was conveyed via email on March 5).

In response, Dr. Shao advised Elli Kim that she will not be able to fulfill the main duties/roles for this event discussed above due to being the sole Korean librarian. This advice was shared via email on March 5, Elli Kim communicated Dr. Shao's concerns to ASME/ABA. ASME/ABA proposed reducing Elli's roles to focus specifically on areas requiring a Korean specialist's expertise and knowledge during a Zoom meeting on March 6. And Elli Kim informed Dr. Shao of the discussion details and sent him a newly revised program. Following this, as a co-sponsor of the event, Dr. Shao worked closely with Elli Kim to support the event. For instance, Dr. Shao offered guidance, including advising on submitting an LC Special Event Form to the

*Event Committee for review and approval by AD/ASME as co-sponsors of the event. This guidance was shared via email on April 8, 2023. Additionally, Dr. Shao also offered to ask Associate Librarian, Hannah Sommers whether she can give welcomeing remark. This was communicated via email on April 7.*

*On April 13, Dr. Shao informed Elli Kim that in the meeting regarding the LOC-KLA conference with Beacher [Wiggins], Eugene [Flanagan], Jessalyn [Zoom] and Elizabeth [Schreiber-Byers]. It was decided that AD will not be talking the lead and not be involved in the planning process of the conference; and AD may provide support to the ASME if they want to get some related materials from the AD collections. This communication was shared via email on April 13. In accordance with Dr. Shao's directives, Elli Kim transferred her duties and role to other divisions, namely ASME/ABA and VHP. However, ASME/ABA encountered challenges in continuing the event organization. As a result, they inquired about Elli Kim's intention to participate. Elli Kim stated that she would only participate in the event with Dr. Shao's approval, as indicated in an email on April 14. Subsequently, during a Zoom meeting on April 15, ASME/ABA asked Elli Kim to discuss the matter with Dr. Shao once more.  After a discussion with Elli Kim, Dr. Shao approved and supported AD's participation. This decision was conveyed during an in-person conversation around April 17. She informed ASME/ABA of Dr. Shao's decision and ASME/ABA announced AD's participation via email on April 18. On May 1, ASME/ABA sought Dr. Shao's approval for Elli Kim's main tasks concerning the event, including serving as a moderator, organizing the AD tour, and inviting 50 guests. Dr. Shao approved Elli Kim's tasks as communicated via email on May 1.*

*On June 7, Dr. Shao sent Elli Kim an email expressing concern about AD not being recognized as a co-sponsor of the event in the program and appearing to minimize Elli Kim's contributions to the event. Elli Kim, in response, conveyed that she believed Dr. Shao's approval of participation on April 17 indicated AD's role as a co-sponsor. She then detailed how AD fulfilled significant duties, including setting up the conference theme, organizing program contents, inviting guest speakers, an invitation list for attendees, and arranging the ARR tour. AD actively participated as part of the planning committee. Of particular note was Dr. Shao's acknowledgement that Elli Kim had to dedicate her personal time during her vacation in Korea, to work on the invitations. Given the event's occurrence on two weekdays with a full-day program, making it challenging for many to attend, however, Elli Kim, as the Korea specialist, diligently encouraged on-site attendance. Over 50 guests attended on the first day and 27 guests on the second day, including academics, leaders from the Korean American community, various branches of government staff, NGOs, and CRS interns.*

51.     Mr. Flanagan criticized Dr. Shao for causing confusion in different areas of the Library, including events, communications, and ABA. In contrast, after the event, the Korean reference librarian informed Dr. Shao of the resounding success of the conference in a detailed report sent on June 28, 2023, via email. Many Professors and graduate students in the D.C. area attended the event and expressed deep

admiration for the panel content, mentioning that the conference theme, "humanistic approach to the U.S.-Korean alliance," was truly inspiring. They regarded it as not only an academic achievement, but also a meaningful contribution to public service. The audience expressed a desire for a recurring conference, hoping to establish it as an annual event.

## G. The Case of Supporting a New Supervisor

52.     Mr. Flanagan falsely accused Dr. Shao of failing to cooperate with a new supervisor. In fact, Dr. Shao experienced tremendous stress from his administrative work, and this was compounded due to several months of acting head duties for both the Scholarly Service Section and the Collection Services Section, as well as providing training to all new employees including two new supervisors. Moreover, Dr. Shao had a workplace injury on April 11, 2023, due to a defective carpet floor tile in the AMED Reading Room. However, he continued to oversee the operation of the whole division as an outstanding leader for more than three months, in spite of his painful work-related injury. Dr. Shao began FY2023 in a difficult position with both the Head of Scholarly Services and an experienced Korean reference specialist—both also Recommending Officers (ROs)-- having left the Library in May and July 2022 respectfully. He strengthened the Asian Division and overcame significant staffing challenges in FY2023 by attracting new talent, training and developing the skills of new and recently hired staff, providing career development opportunities to existing staff, and temporarily taking on direct responsibility for sections to cover gaps. Following the resignation of the Scholarly Services Head in FY2022, he directly participated in searches and filled this and other positions. Dr. Shao designed recruitment strategies and prioritized the groups with the most significant under-representation, and he ensured AD staff opportunities to participate in the hiring process by serving on interview panels. The new hires are critical to the success of the Asian Division's collection services, development, and management. Dr. Shao helped the new GS-14 section head to settle down,

and provided constant support to her for supervisory duties, recommendation work, reference services, collection management, and digitization projects.

**H. The Case of "Avoiding" Library of Congress Committees**

53. Contrary to what Mr. Flanagan falsely claimed, in FY2023 Dr. Shao has been participating in the following groups and committees: LCAP Management Stakeholders Group; Inventory Management Policy Group; Image Description Working Group; Program Development Group Lunchtime Forum; Reference Round Table (RRT); Tibetan rare book cataloging team; Asian Division Reorganization Committee; Collections Safeguarding Plan Group; China Web Archiving group; Innovator in Residence Office group; and the Transfer team of AAPI Collection to the Manuscript Division and American Folklife Center.

54. Mr. Flangan continues to exclude Dr. Shao from joining internal committees. He was able to do so because these committees require supervisor's recommendations or permissions.

55. As GICD Director, Mr. Flanagan has not been committed to a diverse workforce, not maintaining high standards of honesty and integrity, never communicating to him the GICD's goals and priorities. Reports and complaints about GICD's toxic workplace and widespread harassment should lead to bipartisan calls for investigations. Many women in GICD quit their job over the behavior, because Mr. Flangan had bullied employees and helped personally cultivate a culture that allowed harassment and discrimination to fester. The GICD employees also said they often feared retaliation if they reported wrongdoing. Mr. Flanagan does not work well with employees of different backgrounds, and Dr. Shao did not know what Mr. Flanagan expected of him on the job. He never provides Dr. Shao with constructive suggestions to improve his job performance, therefore Dr. Shao's performance appraisal is not a fair reflection of his performance. Dr. Shao has no trust and confidence in Mr. Flanagan, knowing also that he never treats Dr. Shao with respect. In fact, Mr. Flanagan is engaging in inappropriate activities against

Dr. Shao. Mr. Flanagan has been neglecting Dr. Shao's good work as one way of retaliation. In fact, Mr. Flanagan violated Dr. Shao's workplace rights.

56.     Mr. Flangan has never taken steps to cease his supervisory harassment and discrimination against Dr. Shao. Dr. Shao personally experienced many incidents of harassment from his supervisor, the GICD Director: he ignored and isolated Dr. Shao; he made insulting and demeaning comments; he made verbal threats; he made offensive comments; he made crude remarks; he treated Dr. Shao in a way that made Dr. Shao uncomfortable. There have been widespread reports and complaints about a toxic work environment in the GICD under Mr. Flanagan. Mr. Flanagan was fostering an abusive culture rift with harassment and discrimination in the GICD. Many employees in the GICD felt very uncomfortable, disrespected and harassed, including Chief of Serials and Government Documents Division, Chief of Science, Technology and Business Division, Chief of Researcher and Reference Services Division, Head of Hispanic Reading Room, Head of European Reading Room, AMED Division Program Specialist, Reference Specialist of Hebraic Section, Reference Librarians of African Section (one of them suddenly died last year after her lawyer had deposed Mr. Flanagan in her legal case against the Library, and a gift fund in memory of her has been set up in the Library by her colleagues). All of them are African Americans, Asian Americans, or Senior Citizens. They all have complained about misconduct and mismanagement of this abnormally harsh manager, who they know he has intended to offend them, hurt them, or cause them pain. The GICD specialists and supervisors in recent years has signaled the high level of frustration and unhappiness these people have experienced under Mr. Flanagan's mismanagement. He has never built goodwill with the GICD staff members; he never reaches out to the AD employees to effectively implement the Library's mission and goals. The wave of exits certainly raises serious concerns about Mr. Flanagan's management problems. In fact, the GICD has lost a lot of people, a lot of good people, as Dr. Shao as

well as current and former Library employees with knowledge of the departure attest. "He's really mean and tough on employees, and he hasn't figured out a way to have relationships in other parts of the Library administration, which is how he does his job," said one former employee familiar with the staffing issues. Notably, there were mass departures in the GICD and serious retention issues. Mr. Flangan's efforts to fill these vacancies are already running into trouble.

57. Mr. Flanagan unjustifiably scolded Dr. Shao in the GICD Director office and in his emails so severely, that later Library colleagues came to Dr. Shao privately to check on his well-being.

**I. The Case of Serving as Acting Director**

58. Mr. Flanagan has continued to appoint White chiefs, whose seniority is lower than Dr. Shao to serve as acting director of GICD during the last several years. This kind of inequality, unfairness, prejudice, and favoritism reveals again Mr. Flanagan's discrimination against Asian Americans and other underrepresented ethnic groups. It seems that he never pays attention to diversity and equality. A GICD supervisor asked Dongfang Shao, "Why are you not acting director? You are the true senior level and have the most GICD experience." These facts are causes for worry, but staff members are more alarmed at his years of experience in labor analytics — the art of eliminating as many jobs as possible.

59. Despite Dr. Shao's success, he consistently struggled since Mr. Flangan became the GICD director in 2018 with fair ratings in annual performance reviews at the Library. Dr Shao noticed that he felt stalled and frustrated in his performance reviews. Because of the relational and psychological discomforts caused by Mr. Flanagan's unfair and racist treatment, Dr. Shao noticed that during the past year, he avoided speaking in many GICD meetings, especially in the wake of the harassment and retaliation on him. It is very difficult to describe this feeling of ignorance and discrimination, but it approached something like grieving. Stress is taking its toll on Dr. Shao. Mr. Flanagan's mistreatment

has become torturous, both physically and mentally to the point that Dr. Shao feels nauseated after dealing with Mr. Flanagan.  Now Dr. Shao often experiences nightmares. Changes have occurred also in his attitude toward work, in his level of self-esteem, and even in his eating habits, and more recently, troubles in getting to sleep. As a consequence of all these struggles, there has been a change in his pattern of living and desire for socializing. For example, he has isolated himself from other chiefs of the GICD, as well as other colleagues and friends. There has also been an obvious change in whether and how he experiences anger and sadness. Unfortunately, there has ever been a change in the number, frequency, and severity of his physical injuries in the workplace and elsewhere. One of former directors of the Library, who was one of Mr. Flanagan's predecessors, wrote to Dr. Shao,

> *I truly understand and appreciate the position you are currently in. You are an exceptional human being. Honest and committed to the highest social and cultural values — and willing to fight for truth and honesty. You are the best kind of immigrant for the US. You deserve more than LC can provide. I do not want you to be bitter. It eats your soul.*

> *Eugene is an insecure nobody, abused by years of disdain by LC bosses, and doubtless afraid of his chiefs. I am so sorry you have to experience all this. You were the most important person I had the opportunity to hire. I admire you greatly. You deserve much more administrative support and professional acknowledgement than you have gained at LC.*

Library employees of people of color like Dr. Shao often feel excluded and ignored, to the point that he feels at times he does not belong in the GICD— feelings that contribute to his heightened stress. Mr. Flanagan has never helped Dr. Shao by alleviating those stressful situations, or by making him feel recognized and heard. Even while other federal institutions are making changes and have initiated new effort in supporting diversity and inclusion, racism and microaggressions still take a terrible toll in the Library of Congress, especially in the GICD.  Dr. Shao had been carrying these burdens with him ever since Mr. Flanagan was appointed as the GICD director in the fall of 2018, and that has at times turned into depression, anxiety, and other problems. Dr. Shao's stress levels are also manifested physically, leading to problems of hypertension and sever insomnia cause by stress and anxiety, among

other conditions. As a Library Senior manager, Mr. Flangan has notably never asked Dr. Shao as a minority employee for feedback and suggestions about promoting diversity and inclusion. He does not understand workplace factors like racial battle fatigue — the psychological and physiological effects on people of color, who include Dr. Shao, in responding to continual microaggressions and racism. In the recruitment, Mr. Flanagan always excludes Dr. Shao from search panels for hiring GICD chiefs. To exclude a qualified manager from the underrepresented racial groups defined as the APIA (Asian and Pacific Islander Americans) is simply another way of reinforcing his own bias against diversity and inclusion.

60.    The allegations in this Complaint incorporate the allegations in the Claim submitted to the OWCR. [Complaint Exhibit 4].

61.    On December 29, 2023, the Office of Congressional Workplace Rights issued its Report on Preliminary Review of Dr. Shao's allegations. [Complaint Exhibit 5].  The Preliminary Hearing Officer made the following findings:

> In support of his discrimination and harassment claims, the Claimant discussed, at great length, his background, his qualifications, as well as the specific reasons why he believed the FY/23 Performance Review was unsupported, erroneous, discriminatory, and harassing. He also submitted copies of his "Statement of Accomplishments" for his FY/23 Performance Review, his response to the Performance Review that he was given, and his request for review of that rating. Additionally, the Claimant submitted excerpts of numerous emails and text messages from colleagues concerning his performance, statements of praise that was written about his qualifications, and other evidence concerning his performance during the period at issue, in support of his claims. Further, the Claimant alleged that Mr. Flanagan had never been in touch with any Asian Division employees (except for the less than 10-minute meetings he had during the whole year with him), that there were mass departures of Chiefs in the GICD, and retention issues, due to Mr. Flanagan's mismanagement, and that Mr. Flanagan misrepresented his, and other the Asian Division's staff, blaming them with "all kinds of trumped-up charges." Moreover, Claimant alleged that Mr. Flanagan made unwelcome comments about a veteran, that he was disrespectful when addressing the Asian staff, and that he continued to appoint white Acting Directors of the GICD, whose seniority is lower than his.
>
> Additionally, the Claimant alleged that Mr. Flanagan gave him "an unfair and unsupported Performance Review in FY/23" because he reported Mr. Flanagan's

*mismanagement through the OIC hotline, filed two OCWR complaints against the agency alleging discrimination, and because he filed two lawsuits in 2020 and 2021 (alleging that Mr. Flanagan repeatedly used vulgar, inappropriate and gendered comments, in addition to giving him a lower performance rating and baselessly blaming him for things that he did not know). The Claimant also alleged that he did not know what Mr. Flanagan expected of him, that Mr. Flanagan never provided him with any constructive suggestions, and that Mr. Flanagan "never treated [him] with respect." Further, Claimant argued that that he has a reasonable belief that Mr. Flanagan, by his actions, engaged in a "discriminatory employment practice," that this complaint is a "racial justice issue at its core," and that "[d]emanding workplace climate change and ending racial injustice has been major part of [his] lawsuit."*

*In addition, the Claimant alleged that, in retaliation for his protected activities, Mr. Flanagan either ignored or downplayed his accomplishments, that he isolated him, and made insulting, demeaning, offensive and crude comments to him, as well as verbal threats. Finally, the Claimant discussed the consequences of his alleged discriminatory and harassing mistreatment by Mr. Flanagan, and the specific damages that he claims to have suffered as a result.*

*The legal issues presented concerning these claims are whether the Claimant's allegations, if true, would establish: (1) that he was subjected to discrimination and harassment (prohibited under 2 U.S.C. Section 1311) by Mr. Flanagan because of his race (Asian), Disability (a workplace injury), Color (Yellow) National Origin (China) and Age (70), and if so, whether he would be entitled to the remedies he seeks.*

*Viewing the Claimant's discrimination and harassment claims in the matter most favorable to him, I conclude that he has sufficiently stated a claim for which, if the allegations contained in the Claim are true, relief may be granted under the CAA. ...*

*The Claimant additionally alleged Reprisal under 2 U.S.C. Section 1317, and specifically that he "opposed a practice made unlawful by the CAA or initiated proceedings, filed a claim, or testified, assisted, or participated in a hearing or other proceeding under the CAA."*

*As noted previously, on his Claim Form, the Claimant stated that he had previously filed two OCWR complaints against Mr. Flanagan for discrimination and harassment, and two related lawsuits in 2020 and 2021. In support of his "Reprisal Claim," the Claimant appears to allege that he was reprised against, after filing his prior OCWR complaints, as well as the two related lawsuits, in the same manner, and based on the same facts and incidents discussed previously with regard to the discrimination and harassment claims (in essence his alleged erroneous and unsupported FY/23 Performance Review that Mr. Flanagan gave him, as well as the numerous allegations of mistreatment by Mr. Flanagan).*

*The legal issues presented in this claim are whether the Claimant's allegations, if true, would establish that Mr. Flanagan took the above actions in reprisal for his engaging in protected activity under the CAA, and if so, whether he would be entitled to the remedies he seeks. ...*

*Under 2. U.S.C. Section 1317, Reprisal, it is unlawful for an employing office to take reprisal for an employee opposing a practice made unlawful by the CAA, or for the employee to initiate proceedings, file a claim, or to testify, assist, or participate in a hearing or other proceeding under the CAA.*

*In this case, the Claimant alleged that agency officials took reprisal against him, because of his prior OCWR discrimination complaints and his two related lawsuits that are pending. As with the discrimination and retaliation claims, he specifically alleged that Mr. Flanagan issued what he claims was an unfair and unsupported FY/23 Performance Review, and by taking all of the other actions discussed previously. Timewise, it appears that the FY/23 Performance Review, and the additional actions cited by the Claimant, could have been in reprisal for his engaging in the protected activity identified by this claim.*

*Viewing the Claimant's "reprisal" claims in the manner most favorable to him, I find that he has sufficiently stated a claim for which, if the allegations contained in his Claim are true, relief may be granted under the CAA. ...*

*The CAA, Section 202 (2 U.S.C. Section 1312) applies provisions of the Family and Medical Leave Act (FMLA), which entitles employees to take up to 12 weeks of unpaid, job-protected leave for certain family and medical reasons such as birth or placement of a child for adoption or foster care, an employee's serious health condition, or the care of a family member with a serious health condition. Under some circumstances, employees may take family and medical leave intermittently or on a reduced leave schedule. It is also possible that an eligible employee may choose, or an employing office may require, that an employee substitute vacation, sick or other types of personal leave for some or all of their unpaid FMLA leave.*

*To establish a FMLA retaliation claim based on circumstantial evidence, a Claimant must show: (1) he availed himself of a protected right under FMLA; (2) he suffered an adverse employment action; and (3) there was a causal connection between the adverse action and the protected activity. It is important to note that a FMLA retaliation claim can be brought even if the employee managed to take the full leave requested. ...*

*On his Claim Form, the Claimant checked the box alleging that the agency violated the Family and Medical Leave Act, specifically by "Retaliation". Claim Form, p. 5. He also alleged on his Attachment to his Claim Form, that Mr. Flanagan retaliated against him for filing such a claim "by purposefully charging his absence to his request to attend onsite meetings to ignore [his] workplace inquiry protected by Department of Labor for medical treatment and telework accommodation by an orthopedic doctor." Attachment to the Claim Form, Section C, p. 4.*

*While not entirely clear, it appears that the Claimant is alleging that he was improperly charged with an absence that should have been covered by the FMLA, which was instead charged to some other type of leave. It also appears that he is claiming that this was in retaliation for his having filed the prior OCWR complaints, and the two pending lawsuits.*

*Viewing the Claimant's "FMLA" claim in the manner most favorable to him, I find that he has sufficiently stated a claim for which, if the allegations contained in his*

*Claim Form are true, relief may be granted under the CAA. ...*

> *Based on the foregoing, I have determined that the Claimant was a covered employee, with a covered agency, who has filed a timely complaint, and has stated claims of discrimination and harassment under 2 U.S.C. Section 1311, based on (1) Race (Asian), (2) Disability (a workplace injury), (3) Color (Yellow); (4) National origin (Chinese), and (5) Age (70). He additionally stated claims of "Reprisal" under 2 U.S.C. Section 1317, and Family and Medical Leave under 2 U.S.C. Section 1312 (Retaliation). With regard to all of the above claims, I have determined that, if the allegations contained in the Claim Form are true, relief may be granted under the CAA.*

One of GICD chiefs wrote to Dr. Shao regarding his complaint against Mr. Flanagan,

> *I am hoping you prevail to the extent that the Librarian of Congress will be so embarrassed on behalf of the institution that she assigns Flanagan to Ft Meade permanently to inventory collections using skills he acquired running the gift shop.*

> *Many people of color in GICD and senior citizens who have been working for Flanagan need a Racial advocate to help people of color manage racial stressors and heal from trauma. And also needed is a directorate-wide exorcism to remove the collective stench from our souls of Flanagan's "leadership." It will not look good for Eugene Flanagan if the Library continues to be sued by people he supervises. What is important is that others seriously observing him, for he has been a source of problems that are not insignificant.*

In a June 2021 letter by the APA Justice Task Force sent to U.S. Commerce Secretary Gina Raimondo to their deep concerns regarding racial discrimination against Chinese immigrants, it stated,

> *Dr. Dongfang Shao, Chief of the Asia Division at the Library of Congress at the SL pay level, is one of a few cases that has reached the court system. Performance evaluations, like security clearance, can also be weaponized for discrimination against Asian Americans serving in the federal government.*

Although Mr. Flanagan was hoping to make it as hard as possible for Dr. Shao to work, Dr. Shao found the courage to keep moving forward, to keep pushing in the face of hardship and injustice. The plaintiff therefore needs to underscore his belief, that unless the court convicts Mr. Flanagan, he could go on to incite future discrimination, harassment, and retaliation against many others as well. Very unfortunately,

anti-Asian racism, especially anti-Chinese American racism, has been on the rise in our country since the start of the pandemic. For the sake of as the common good, we treasure as the USA, racists should have no place in the Library of Congress, especially in the GICD.

## REQUESTED REMEDY

62.     Wherefore, Dr. Shao respectfully requests that this Court enter judgement in his favor and against the Defendant, and award the following reliefs:

63.     Declaratory relief, including but not limited to a declaration that Defendant's discriminatory conduct of the types of which Plaintiff complains herein violate Title VII of the Civil Rights Act of 1964.

64.     Injunctive relief, including but not limited to an order restraining Defendant from engaging in any further discriminatory conduct of the types of which Plaintiff complains herein.

65.     Raise Plaintiff's performance rating for FY2023 to "Outstanding" with the commensurate salary and awards.

66.     Compensatory damages in an amount to be determined.

67.     Attorneys' fees and costs.

68.     Any additional relief as justice allows.

## JURY DEMAND

Plaintiff demands a jury trial.


Respectfully submitted,


/s/ Jonathan G. Axelrod
Jonathan G. Axelrod (D.C. Bar No. 210245) Beins,
Axelrod & Keating, P.C.
1717 K Street, NW, Suite 900
Washington, DC 20006
(202) 365-1610
jaxelrod@beinsaxelrod.com

Counsel for the Plaintiff